WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Libertarian Party, et al., | No. CV-16-01019-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Michele Reagan, | |
| Defendant. | |

Plaintiffs challenge the constitutionality of A.R.S. §§ 16-321 and 16-322, as amended in 2015 by H.B. 2608. Plaintiffs seek a preliminary injunction regarding the number of votes required for write-in candidates in the Arizona primary elections to be held next month. Doc. 18. The issues are fully briefed (Docs. 26, 28, 31), and the Court heard oral arguments on July 12, 2016. For the following reasons, the Court will deny Plaintiffs' motion for a preliminary injunction.

**I.   Background.**

Plaintiffs are the Arizona Libertarian Party ("AZLP") and Michael Kielsky, the party's chairman and a candidate for public office. Defendant Michele Reagan is the Arizona Secretary of State ("the Secretary"), the officer responsible for administering elections.

In Arizona, a candidate for public office who wishes to have her name appear on the general election ballot must follow one of two paths. The candidate may file a

nomination petition with the Secretary by a specified date before the primary election, A.R.S. § 16-314(A), which includes a specified number of signatures from voters in the relevant jurisdiction, *see* A.R.S. § 16-322(A).  The candidate must then win the primary by receiving the most votes of her party's candidates.  A.R.S. § 16-645(A). Alternatively, the candidate may qualify for the general election as a write-in candidate.  A.R.S. § 16-312(A).  This path also requires the filing of a nomination petition before the primary election, but the petition need not be supported by voter signatures.  Instead, the candidate must win the primary election and receive a number of write-in votes "equivalent to at least the same number of signatures required by § 16-322 for nominating petitions for the same office."  A.R.S. § 16-645(E).[1]

H.B. 2608 became effective on July 3, 2015.  Doc. 12 at 3.  Among other changes, H.B. 2608 altered the pool of persons from which candidates affiliated with a political party can collect signatures for nomination petitions.  Under the old system, a candidate could collect signatures only from people who were qualified to vote in the candidate's primary election.  *See* 2015 Ariz. Sess. Laws Ch. 293, §§ 2-3 (H.B. 2608).  Thus, if a candidate's party chose to hold an open primary, the candidate could collect signatures from registered party members, registered independents, and unaffiliated voters.  If a candidate's party opted for a closed primary, the candidate could collect signatures only from registered party members.  H.B. 2608 changed the pool of eligible signers.  The pool is now described as "qualified signers," and includes (1) registered members of the candidate's party, (2) registered members of a political party that is not entitled to continued representation on the ballot under A.R.S. § 16-804, and (3) voters who are registered as independent or having no party preference.  A.R.S. § 16-321(F).  This new pool of "qualified signers" is larger than the pool available before H.B. 2608 for candidates whose parties hold closed primaries.  Thus, although H.B. 2608 lowered the

---

[1] For purposes of this order, the Court will use the word "party" to refer to Arizona political parties which are entitled to continued representation on the ballot.  The Court understands that AZLP is such a party.  Arizona has established somewhat different requirements for smaller parties and unaffiliated candidates that are not discussed by the parties in their briefing and do not appear relevant to this decision.

prescribed percentage of the pool that candidates must satisfy, it actually increased the number of signatures some candidates must obtain by increasing the pool of signers against which the percentage is measured. *See* 2015 Ariz. Sess. Laws Ch. 293, § 3 (H.B. 2608).

The increase is significant for AZLP candidates. For example, an AZLP candidate competing in legislative district 11 in 2012 needed to collect 25 signatures to access the primary ballot or 25 write-in votes to access the general election ballot. Doc. 1 at 36, ¶ 2. Now, an AZLP candidate in district 11 must obtain 220 signatures or write-in votes, which represents 26.12% of registered AZLP members in the district. *Id.* at 38, ¶ 9. AZLP candidates seeking other Arizona offices face similar increases in both raw numbers and percentages of registered AZLP members. *Id.* at 36-37, ¶ 3; 38, ¶ 10 (congressional district 1 increased from 60 to 636 signatures or write-in votes, or 25.75% of AZLP members); *id.* at 40, ¶¶ 2-3 (Arizona Corporation Commission increased from 130 to 3,023 signatures or write-in votes, or 11.9% of AZLP members); *id.* at 50, ¶¶ 10-11 (Maricopa County Attorney increased from 88 to 1,881 signatures or write-in votes, or 11.18% of AZLP members); *id.* at 52-53, ¶¶ 3, 6 (congressional district 6 increased from 25 to 717 signatures or write-in votes, or 28.1% of AZLP members); *id.* at 44-45, ¶ 4 (legislative district 18 requires 356 signatures or write-in votes, or 30.53% of AZLP members); *id.* at 45, ¶ 5 (congressional district 9 requires 675 signatures or write-in votes, or 18.43% of AZLP members); *id.* at 58, ¶ 4 (congressional district 6 requires 782 signatures or write-in votes, or 22.29% of AZLP members).

For the upcoming primary elections, candidates were required to file signature-supported nomination petitions by June 1, 2016 in order to have their name printed on the primary ballot. Doc. 10 at 6. Plaintiffs asked the Court to enter a temporary restraining that would have required the Secretary to apply pre-H.B. 2608 signature requirements to these petitions, but the Court denied the motion because it was filed too late in the nomination petition process. Doc. 17 at 3-8.

The current motion for a preliminary injunction focuses on write-in candidates. Plaintiffs ask the Court to order the Secretary to place write-in candidates on the general election ballot if they win the AZLP primary and receive the number of write-in votes required before the passage of H.B. 2608. Doc. 18 at 5. The primary elections are scheduled for August 30, 2016. *Id.* at 5. The AZLP will have a closed primary this year, meaning that only registered AZLP members may vote. Doc. 12-1 at 3, ¶ 11.

**II.     Legal Standard.**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must show that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Id*. at 20. "But if a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (emphasis in original; internal quotation marks and citation omitted). Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Regardless of which applies, the movant "carries the burden of proof on each element of either test." *See Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000) (citing *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)).

**III.    Analysis.**

Plaintiffs argue that they are entitled to injunctive relief because each of the four *Winter* factors weighs in their favor. For reasons explained below, Plaintiffs have not shown that they are likely to succeed on the merits. Plaintiffs have raised serious questions regarding the constitutionality of H.B. 2608, but they have not shown that the

- 4 -

balance of hardships tips sharply in their favor or that they are likely to suffer irreparable harm.

## A. Likelihood of Success and Serious Questions.

"The Supreme Court has held that when an election law is challenged, its validity depends on the severity of the burden it imposes on the exercise of constitutional rights and the strength of the state interests it serves." *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008). "In determining the nature and magnitude of the burden" an election procedure imposes, courts "must examine the entire scheme regulating ballot access." *Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 761-62 (9th Cir. 1994) (citing *Mandel v. Bradley*, 432 U.S. 173, 177-78 (1977)). "The question is whether 'reasonably diligent' minor party candidates can normally gain a place on the ballot, or if instead they only rarely will succeed." *Id.* (citing *Storer v. Brown*, 415 U.S. 724, 742 (1974)).

A state "election regulation that imposes a severe burden is subject to strict scrutiny and will be upheld only if it is narrowly tailored to serve a compelling state interest." *Nader*, 531 F.3d at 1035 (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). A regulation that imposes "reasonable, nondiscriminatory restrictions" is subject to a lesser standard of review, *Burdick*, 504 U.S. at 434 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)), which can usually be satisfied by "a state's 'important regulatory interests,'" *Nader*, 531 F.3d at 1035 (citing *Burdick*, 504 U.S. at 434). With a de minimis burden on a plaintiff's constitutional rights, a defendant need demonstrate only that its election regulations are "rationally related to a legitimate state interest." *Libertarian Party of Wash.*, 31 F.3d at 763 (citations omitted).

Plaintiffs argue that H.B. 2608 violates Supreme Court precedent by requiring AZLP candidates to obtain signatures or write-in votes from more than five percent of the party's registered voters. In *Williams v. Rhodes*, 393 U.S. 23 (1968), the Supreme Court addressed a series of election laws in Ohio that required members of new political parties who wished to appear on the presidential ballot to not only obtain petitions signed by fifteen percent of the number of voters in the last gubernatorial election, but also to

satisfy other procedural hurdles. *Id*. at 24-25. The Court found that Ohio's "restrictive provisions [made] it virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties," *id.* at 25, and held that the scheme violated the Equal Protection Clause of the Fourteenth Amendment, *id.* at 34.

In *Jenness v. Fortson*, 403 U.S. 431 (1971), the Supreme Court addressed a Georgia law that permitted a candidate who failed to win his party's primary election to have his name printed on the general election ballot if he obtained signatures from five percent of the registered voters in the last general election. *Id*. at 432. The Court found that the five percent requirement, although higher than most other states, was "balanced by the fact that Georgia [had] imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes." *Id.* at 442. The Court upheld the five percent requirement. *Id.*

In *Storer v. Brown*, 415 U.S. 724 (1974), the Supreme Court examined a California law that required independent candidates who wished to appear on the general election ballot to obtain signatures of between five and six percent of the entire vote cast in the preceding general election in the area where the candidate seeks office. *Id*. at 726-27. The candidate's petition could not, however, be signed by voters who had voted in the preceding primary election. *Id.* at 739. Because the pool of qualified signers was reduced by excluding primary election voters – which could effectively increase the burden on candidates above five percent – the Supreme Court remanded the case to determine the precise extent of the burden. *Id.* at 740, 746.

Many view these cases as setting an upper limit of five percent on voter support states may demand for access to the ballot. Plaintiffs note that many courts have invalidated state laws requiring a higher percentage. Doc. 18 at 11-12 (citing *Lee v. Keith*, 463 F.3d 763 (7th Cir. 2006) (10%); *Obie v. N.C. State Bd. of Elections*, 762 F. Supp. 119 (E.D.N.C. 1991) (10%); *Greaves v. State Bd. of Elections of N.C.*, 508 F. Supp. 78 (E.D.N.C. 1980) (10%); *Lendall v. Jernigan*, 424 F. Supp. 951 (E.D. Ark. 1977) (10%); *Am. Party of Ark. v. Jernigan*, 424 F. Supp. 943 (E.D. Ark. 1977) (7%); *Lendall v.*

*Bryant*, 387 F. Supp. 397 (E.D. Ark. 1975) (15%); *Socialist Labor Party v. Rhodes*, 318 F. Supp. 1262 (S.D. Ohio 1970) (7%)).

Plaintiffs claim that H.B. 2608 imposes a more severe burden on AZLP candidates than these cases allow. An AZLP write-in candidate for legislative district 18 must obtain votes equal to 30.53% of the registered AZLP members in that district. Doc. 18 at 12. Plaintiffs calculate this percentage by determining the total number of votes required by the statute (0.50% of "qualified signers") and dividing it by the number of registered AZLP members who can vote in the district 18 closed primary. Because the number of AZLP members in the district is considerably smaller than the pool of qualified signers under the statute, the resulting percentage is much higher than appears in the statute – 30.53% vs. 0.50%. Plaintiffs show that other AZLP write-in candidates must obtain votes of "more than 20 percent of the eligible Libertarian voters" to access the general election ballot. *Id.*

When measured as a percentage of qualified signers as defined in A.R.S. § 16-321(F), the required number of signatures – 0.50% – is well within the five percent outer limit approved by the Supreme Court in *Jenness*. When measured as a percentage of eligible voters in the closed primary, the require number of signatures is much higher than five percent. The question, then, is whether Plaintiffs' math is right. Should the relevant percentage be calculated using the number of "qualified signers" prescribed by the statute or the number of AZLP members who can vote in the closed primary? *Williams*, *Jenness*, and *Storer* all concerned signature requirements to qualify for general elections. They did not concern votes required in a closed primary.

The Secretary relies on a Ninth Circuit case that did address a closed primary, *Lightfoot v. Eu*, 964 F.2d 865, 866 (9th Cir. 1992). The California law at issue in *Lightfoot* provided that write-in candidates could qualify for the general election by receiving votes in their primary "equal in number to 1 percent of all votes cast for the office at the last preceding general election." *Id.* at 866 (quotation marks and citation omitted). Even though the California Libertarian Party demonstrated that this percentage

1 was impossible for Libertarian candidates to meet in the party's closed primary, the Ninth
2 Circuit upheld the law:

> [T]he small number of voters eligible to vote in the Libertarian primary is not an impediment created by the State of California. The Libertarian Party could broaden the number of voters that participate in its primary by opening its currently closed primary to non-Libertarians, and the State could not prevent it from doing so. If, as the Party contends, it is unwilling to open its primary, it may broaden its voter base by increasing its membership. If it is unable to do so because its message is not attractive to a large number of voters, that is not the fault of the State. We conclude that, as a general matter, the burden section 6661(a) places on the Party's access to the ballot for the candidate of its choice is slight.

*Id.* at 870 (internal citation omitted).

The Court doubts that *Lightfoot* should control this case. *Lightfoot* expressly noted that California law included an alternative path that provided "easy access to the primary ballot" – a minor party candidate could simply gather 40 to 65 signatures. *Id.* at 870, 872. No comparable "easy access" alternative is available under H.B. 2608. In addition, the Supreme Court's subsequent decision in *California Democratic Party v. Jones*, 530 U.S. 567 (2000), casts doubt on the Ninth Circuit's suggestion that the Libertarians could solve their problem simply by opening their primary to other parties. *Jones* holds that forcing a party to open its primary and seek support from non-party voters violates the party's First Amendment associational rights.

Even if *Lightfoot* is distinguishable, however, the Court cannot conclude that Plaintiffs have shown they are likely to succeed on the merits. The Court reaches this conclusion for three reasons.

First, the Court is not yet persuaded that Plaintiffs' math – calculating the relevant percentage by using the total number of AZLP members who can vote in the primary rather than the number of qualified signers under H.B. 2608 – is correct. On one hand, Plaintiffs' math does seem to correlate with a broad view of *Williams*, *Jenness*, *Storer*, and their progeny. The signature and write-in requirements are thresholds that candidates must clear to appear on the general election ballot, as were the signature requirements in

those cases, and the Secretary does not dispute that write-in candidates must secure 11 percent to 30 percent of the possible votes in the AZLP primary.

On the other hand, many cases recognize that states legitimately may require that candidates show a reasonable modicum of support before being placed on the general ballot. As the Supreme Court explained in *Jenness*:

> There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot – the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

403 U.S. at 442. Subsequent cases confirm that states may demand a reasonable modicum of support. *See Am. Party of Tex. v. White*, 415 U.S. 767, 782 n.14 (1974); *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986); *Libertarian Party of Wash.*, 31 F.3d at 765; *Lightfoot*, 964 F.2d at 871.

If a state decides that a reasonable modicum of support must be shown to access its general election ballot, and a small party chooses to hold a closed primary election before the general election, how can the prescribed level of support be shown other than by the method Arizona has chosen? For example, if a state legislature decides that candidates should have support of one percent of the general voter base before appearing on a general election ballot, how does the state accomplish that objective if the relevant party opts for a closed primary? If the state requires the modicum of support to be shown by signatures before the primary or by write-in votes cast during the primary (quite possibly the only places it could be shown before the general election), and if the party is small, then the required level of support likely will be a much larger percentage of potential primary voters than one percent and will raise the very concerns Plaintiffs assert here. Stated differently, the well-recognized ability of states to require a reasonable modicum of support to appear on a general election ballot seems to be at odds with the process of choosing candidates through closed, small-party primaries, at least if the percentages from *Jenness* and related cases are deemed relevant. The parties have not

1 addressed this dilemma, and the Court is reluctant to conclude that states cannot demand a reasonable modicum of support simply because a party has opted for a closed primary.

Second, Plaintiffs ask the Court to treat the *Jenness* five percent requirement as controlling, and yet the Supreme Court has made clear that there is "no litmus-paper test" for separating valid from invalid restrictions. *See Storer*, 415 U.S. at 730.  A court must instead examine the entire scheme regulating ballot access. *Williams*, 393 U.S. at 34. The parties devote little attention to Arizona's overall election scheme in their preliminary injunction briefing.

Third, a key question is whether a "reasonably diligent" minor party candidate can be expected to satisfy the ballot requirements. *Libertarian Party of Wash.*, 31 F.3d at 762 (citing *Storer*, 415 U.S. at 742); *see also White*, 415 U.S. at 787 ("Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization."). The Court must have sufficient factual information to evaluate the effect of an election scheme, and Plaintiffs bear the burden of proving that the State's regulation seriously restricts their candidates' access to the ballot. *Storer*, 415 U.S. at 738-39; *Libertarian Party of Wash.*, 31 F.3d at 762.

Plaintiffs have presented evidence that fewer AZLP candidates qualified for the primary this year through the signature-collection process, Doc. 18 at 22-23, ¶¶ 6-10, but this motion concerns write-in candidates, not candidates who qualify through signatures. Other than H.B. 2608's higher numerical requirements, Plaintiffs have presented no evidence that would allow the Court to assess the severity of the burden AZLP write-in candidates face in garnering enough votes to appear on the general election ballot.  For example, Plaintiffs have not presented any evidence of AZLP voter turnout in primary elections, the effect of uncontested elections on AZLP write-in candidates (Plaintiffs note that most of their elections are uncontested), or whether AZLP candidates can meet write-in vote requirements through reasonable diligence and hard work. *See Libertarian Party of Wash.*, 31 F.3d at 762 (citing *Storer*, 415 U.S. at 742). On this scant record, the Court

cannot conclude that AZLP write-in candidates are likely to face a severe burden.[2]

Plaintiffs argued in their reply brief and at oral argument that H.B. 2608 has a discriminatory effect on the AZLP and is therefore subject to strict scrutiny. Plaintiffs' motion does include the word "unequal" in three argument headings, but it contains no discrimination or equal protection argument. Doc. 18 at 8, 15. Because Plaintiffs did not base their motion on H.B. 2608's allegedly discriminatory effect, the Secretary had no opportunity to respond to such arguments and the Court will not accept them now. In addition, H.B. 2608 is facially neutral, and Plaintiffs make no attempt to show discriminatory intent. *Cf. Washington v. Davis*, 426 U.S. 229, 240-41 (1976) (holding that a law is not discriminatory based solely on disproportionate impact).

For all of these reasons, the Court concludes that Plaintiffs have failed to show that they are likely to succeed on the merits. The Court must evaluate Plaintiffs' merits arguments in the context of a more complete factual record and more focused briefing.[3]

## B. Balance of Hardships.

Plaintiffs have shown some hardship – H.B. 2608 has increased the raw number of signatures or write-in votes required. *See* Doc. 1 at 36-37, ¶¶ 2-3; 38, ¶¶ 9-10; 40, ¶¶ 2-3; 50, ¶¶ 10-11; 53-53, ¶¶ 3, 6. Plaintiffs also note that only one AZLP candidate was able

---

[2] Plaintiffs have submitted a number of declarations, but they all concern the burden placed on candidates who seek to qualify for the primary ballot by collecting signatures; they do not address the burden faced by write-in candidates in securing the required number of votes. In the past, AZLP candidates have successfully utilized the write-in process to gain access to the general election ballot. *See* Doc. 1 at 36-37, ¶ 3; 40, ¶ 2; 52, ¶ 3; *see also* Doc. 10 at 24, ¶ 10. Plaintiffs state that they have recruited at least 12 people to run in the upcoming primary as write-in candidates (Doc. 18 at 21-22, ¶ 4), and that they intend to recruit more (*id.* at 22, ¶ 5).

[3] Plaintiffs have raised serious questions regarding the constitutionality of H.B. 2608. In *Storer*, the Supreme Court considered whether a state law prohibiting independent candidates from collecting signatures from voters who had already participated in a party's primary placed too great a burden on the candidates by decreasing "the available pool of possible signers" and, potentially, increasing the percentage of signers a candidate had to enlist. 415 U.S. at 739-40. The Supreme Court reiterated this practical approach in *White*, 415 U.S. at 789, when it examined a restriction's effect on "the pool of eligible signers." For AZLP write-in candidates, the "available pool" of voters in the closed primary is limited to AZLP members. And when that limited pool is used as the denominator, H.B. 2608 requires AZLP write-in candidates to receive votes of between 11 and 30 percent of AZLP members in the relevant jurisdiction.

to collect enough signatures to gain access to the primary election ballot.  But as noted above, this motion focuses on write-in candidates, and Plaintiffs have not presented evidence to show that such candidates will face a particular hardship in accessing the general election ballot.

In addition, the Secretary notes that Plaintiffs' requested relief would "alter the path of the primary election midstream."  Doc. 26 at 15.  The Secretary contends that Plaintiffs' delay has prejudiced candidates who gathered signatures in compliance with H.B. 2608, write-in candidates who made decisions in reliance on H.B. 2608, and voters in the general election who may be misled about the degree of support AZLP candidates have shown to earn their spot on the general election ballot.  *Id.*

Considering Plaintiffs' relative lack of proof with respect to write-in candidates and the Secretary's arguments, the Court finds that Plaintiffs have not shown that the balance of equities tips sharply in their favor.  Plaintiffs therefore have not made the showing needed to obtain a preliminary injunction on the basis of serious questions.

**C.    Irreparable Harm.**

Plaintiffs argue that they will suffer irreparable harm through violation of their First and Fourteenth Amendment rights, but Plaintiffs have not shown they are likely to succeed in establishing such violations.  Plaintiffs claim no other kind of irreparable harm.

**D.    Public Interest.**

"The public interest inquiry primarily addresses impact on non-parties rather than parties. . . .  Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist. Ct., In & For Cty. of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002) (citations omitted).  Because Plaintiffs have not established that their constitutional challenge is likely to succeed on the merits, they have not shown that preliminary injunctive relief would be in the public interest.

**IT IS ORDERED** that Plaintiffs' motion for a preliminary injunction (Doc. 18) is **denied**.

Dated this 20th day of July, 2016.

_____
David G. Campbell
United States District Judge