**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Libertarian Party, et al., | No. CV-16-01019-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Michele Reagan, | |
| Defendant. | |

Plaintiffs Arizona Libertarian Party ("AZLP") and Michael Kielsky, the party's chairman and a candidate for public office, challenge the constitutionality of A.R.S. §§ 16-321 and 16-322 as amended in 2015 by H.B. 2608. Doc. 42. Plaintiffs have filed a motion for summary judgment. Doc. 63. Defendant Michele Reagan, the Arizona Secretary of State ("the Secretary"), has filed a cross-motion for summary judgment. Doc. 69. The motions are fully briefed (Docs. 63, 69, 71, 73), and the Court heard oral argument on June 28, 2017. For the reasons that follow, the Court will deny Plaintiffs' motion and grant the Secretary's motion.

## I. Background.

Arizona law provides that a party qualifies for continued representation on the general ballot if its registered members compromise at least two-thirds of one percent of total registered voters. A.R.S. § 16-804. A party that does not meet this requirement may qualify to appear on the ballot by filing a petition signed by a number of qualified voters equal to or greater than one and one-third percent of the total votes cast for

governor in the immediately preceding general election. A.R.S. § 16-801(A). It is undisputed that AZLP qualifies for continued representation on the general election ballot. Doc. 64 at 2, ¶ 4; Doc. 70 at 2, ¶ 4.[1]

When a candidate from a continued-representation party wishes to have her name appear on the general election ballot, she must follow one of two paths. The candidate may, on a specified date before her party's primary election, file a nomination petition that includes a specified number of signatures from voters in the relevant jurisdiction. *See* A.R.S. §§ 16-322(A), 16-314(A). The candidate must then win the primary by receiving more votes than any other candidate from her party. A.R.S. § 16-645(A). Alternatively, she may qualify for the general election as a write-in candidate. A.R.S. § 16-312(A). This path also requires the filing of a nomination petition before the primary election, but the petition need not be supported by voter signatures. Instead, the candidate must win the primary election and receive a number of write-in votes "equivalent to at least the same number of signatures required by § 16-322 for nominating petitions for the same office." A.R.S. § 16-645(E).

H.B. 2608 became effective on July 3, 2015. Doc. 12 at 3. Among other changes, it altered the pool of persons from which candidates affiliated with a political party can collect signatures for nomination petitions. Under the old system, a candidate could collect signatures only from people who were qualified to vote in the candidate's primary election. *See* 2015 Ariz. Sess. Laws Ch. 293, §§ 2-3 (H.B. 2608). Thus, if a candidate's party chose to hold an open primary, the candidate could collect signatures from registered party members, registered independents, and unaffiliated voters. If a candidate's party opted for a closed primary, the candidate could collect signatures only from registered members of her party.

H.B. 2608 redefined the pool of eligible signers – referred to in the bill as "qualified signers" – to include (1) registered members of the candidate's party,

---

[1] Parties may also qualify for continued representation if its members cast 5% of the total votes for governor or presidential electors in the last general election. A.R.S. § 16-804(A). AZLP does not qualify using this method.

(2) registered members of a political party that is not entitled to continued representation on the ballot under A.R.S. § 16-804, and (3) voters who are registered as independent or having no party preference. A.R.S. § 16-321(F). This redefined pool applies whether a candidate's party holds an open or a closed primary.

This pool of "qualified signers" is larger than the pool available before H.B. 2608 for candidates whose parties hold closed primaries. Although H.B. 2608 lowered the prescribed percentage of the pool from which candidates must obtain signatures, it actually increased the number of signatures closed-primary candidates must obtain by increasing the pool of signers against which the percentage is measured. *See* 2015 Ariz. Sess. Laws Ch. 293, § 3 (H.B. 2608).

The increase is significant for AZLP candidates. For example, an AZLP candidate competing in legislative district 11 in 2012 needed to collect 25 signatures to access the primary ballot, or 25 write-in votes to access the general election ballot. Doc. 1 at 36, ¶ 2. In 2016, the new law required an AZLP candidate in district 11 to obtain 220 signatures or write-in votes, a number which represents 26.12% of registered AZLP members in the district. *Id.* at 38, ¶ 9. AZLP candidates seeking other Arizona offices face similar increases in both raw numbers and percentages of registered AZLP members. *Id.* at 36-37, ¶ 3; 38, ¶ 10 (congressional district 1 increased from 60 to 636 signatures or write-in votes, or 25.75% of AZLP members in the district); *id.* at 40, ¶¶ 2-3 (Arizona Corporation Commission increased from 130 to 3,023 signatures or write-in votes, or 11.9% of AZLP members state-wide); *id.* at 50, ¶¶ 10-11 (Maricopa County Attorney increased from 88 to 1,881 signatures or write-in votes, or 11.18% of AZLP members in Maricopa County).

Plaintiffs filed a motion for a preliminary injunction, asking the Court to enjoin application of A.R.S. §§ 16-321 and 16-322 to write-in candidates in the 2016 election. They asked the Court to order the Secretary to place write-in candidates on the general election ballot if they win the AZLP primary and receive the number of write-in votes required before the passage of H.B. 2608. Doc. 18 at 5. The Court denied the motion,

finding that Plaintiffs had not demonstrated a likelihood of success on the merits. Doc. 34. The Court considered only the constitutionality of the write-in method for achieving ballot access, and did not consider the petition signatures method. On this summary judgment motion, the Court considers Arizona's procedures for candidate ballot access as a whole.

## II. Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. Motion to Strike.

The Secretary filed a motion to strike certain portions of Plaintiffs' motion for summary judgment and related statement of facts, contending that Plaintiffs failed to disclose witnesses whose declarations were submitted with the motion. Additionally, the Secretary argues that Plaintiffs rely on impermissible hearsay.[2]

### A. Undisclosed Declarants.

Federal Rule of Civil Procedure 26 requires parties to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]"

---

[2] The Court denied the motion to strike and ordered the Secretary to address the permissibility of Plaintiffs' evidence in her summary judgment briefing. Doc. 68. The Secretary renewed the motion in her cross-motion for summary judgment. Doc. 69 at 24.

Fed. R. Civ. P. 26(a)(1)(A)(i). If a party makes an inadequate disclosure, it must supplement or correct the disclosure in a timely manner. Fed. R. Civ. P. 26(e)(1)(A). If a party fails to provide information required by Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Plaintiffs' motion for summary judgment relies on declarations from six persons that the Secretary contends were never disclosed under Rule 26(a). Doc. 66 at 9; Doc. 71 at 4. Plaintiffs do not contend that they disclosed these individuals under Rule 26(a), but argue that they were disclosed by alternative means. Doc. 71 at 4. First, Plaintiffs argue that the Secretary identified in her own initial disclosures the following persons as likely to have discoverable information: "Any individual that gathered signatures to run as a Libertarian candidate in the 2016 election cycle," and "Any individual running as a write-in candidate in the Libertarian Party in the 2016 election cycle." *Id.* The six declarants fall within these descriptions. On March 2, 2017, Plaintiffs responded to the Secretary's Interrogatory No. 1 by stating that they would provide a list of candidates who had advised AZLP of their intention to run. *Id.* Plaintiffs provided this list on March 9, including contact information for the candidates. *Id.* On March 17, 2017, the deadline for completion of fact discovery, the Secretary asked Plaintiffs whether they had produced the list of candidates, and Plaintiffs confirmed that they had and resent a direct link to the list.[3] *Id.* While Plaintiffs contend that this course of events shows that the Secretary knew of the individuals who submitted declarations in support of Plaintiffs' motion for summary judgment, it is insufficient to satisfy Rule 26(a) disclosure requirements for several reasons.

Rule 26(a) requires a party to identify "each individual" it "may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i); *see also Ollier v. Sweetwater Union*

---

[3] The deadline for completing fact discovery was extended to March 17, 2017 in an order dated January 13, 2017. Doc. 56 at 2. All depositions were required to commence at least five working days before the deadline. *Id.*

*High Sch. Dist.*, 768 F.3d 843, 863 (9th Cir. 2014); *Robert Kubicek Architects & Assocs., Inc. v. Bosley*, No. CV-11-01945-PHX-JAT, 2013 WL 998222, at *1 (D. Ariz. Mar. 13, 2013). The disclosure must include the name of the individual, the individual's address and phone number, and the subject of the information in the individual's possession. Fed. R. Civ. P. 26(a)(1)(A)(i). The obvious purpose of the rule is to enable the opposing party to prepare to deal with the individual's evidence in the case. *See Ollier*, 768 F.3d at 862-63 ("After disclosures of witnesses are made, a party can conduct discovery of what those witnesses would say on relevant issues, which in turn informs the party's judgment about which witnesses it may want to call at trial, either to controvert testimony or to put it in context.").

Plaintiffs argue that because the Secretary identified a broad class of individuals as having relevant information (those who attempted to run for office as AZLP candidates in 2016), and requested that Plaintiffs identify those individuals, Rule 26(a) was satisfied. But the purpose of Rule 26(a)'s initial disclosure requirement is not merely to apprise the opposing party of the existence of individuals with relevant information, it is to tell the opposing party which individuals the disclosing party "may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). The fact that a party has identified individuals as having relevant information does nothing to inform that party of whether the opposing party may use the individuals as witnesses in the case.

The list Plaintiffs provided included the names of 27 people, their phone numbers and email addresses. Doc. 67-1 at 23-26. Plaintiffs did not disclose the nature of any relevant information these individuals might have, or whether Plaintiffs were considering using them as witnesses in this case. The Secretary received the list, apparently with other discovery documents, less than two weeks before the discovery deadline and with only a few days to schedule depositions.

Because the Secretary was not told that Plaintiffs may use the six declarants to support their claims, and the declarants were not identified until it was too late to depose them, the Court concludes that Plaintiffs failed to satisfy their initial or supplementary

disclosure obligations under Rule 26(a) and (e).  *See L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1169 (D. Colo. 2015) ("a party's collateral disclosure of information . . . must [be] in such a form and of such specificity as to be the functional equivalent of a supplemental discovery response; merely pointing to places in the discovery where the information was mentioned in passing is not sufficient"); *see also Wallace v. U.S.A.A. Life Gen. Agency, Inc.*, 862 F. Supp. 2d 1062, 1067 (D. Nev. 2012) (finding a party's identification of an individual in response to the opposing party's interrogatories insufficient to satisfy the disclosure requirements of Rule 26(a) because, among other reasons, the party did not identify the individual as someone with information that the party may use in establishing its case).

Plaintiffs also argue that the Secretary misstates the duty imposed by Rule 26(a) when she contends that Plaintiffs were required to identify which "candidates the Plaintiffs intended to call as witnesses." Doc. 71 at 6 (quoting Doc. 66 at 7). As Plaintiff notes, a party must identify trial witnesses only thirty days before trial unless otherwise ordered by the court. Fed. R. Civ. P. 26(a)(3)(B). But this is an additional disclosure requirement. It does not affect the party's separate obligation to identify in its initial disclosures all individuals with relevant information whom the party "may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). As the commentary to the Federal Rules makes clear, "'[u]se' includes any use at a pretrial conference, to support a motion, or at trial." Steven S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary Rule 26 (Feb. 2017).

To avoid preclusion, Plaintiffs have the burden of showing that their failure to disclose the six declarants was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); *R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1246 (9th Cir. 2012). Plaintiffs provide no explanation for their failure to include the declarants in their initial or supplemental Rule 26(a) disclosures, and therefore have not shown that it was substantially justified. Because Plaintiffs' failure to disclose the six declarants impeded the ability of the Secretary to depose those declarants and obtain additional evidence to

counter their declarations, the Court concludes that it was not harmless. *See Ollier*, 768 F.3d at 863. The Court accordingly will grant the Secretary's motion to strike.[4]

### B. Hearsay.

The Secretary also asks the Court to strike evidence provided by Plaintiff Kielsky regarding the efforts of another individual to obtain ballot access, contending that this evidence is inadmissible hearsay. Doc. 66 at 10. Plaintiffs' motion for summary judgment cites to Kielsky's third declaration for the proposition that "only one candidate qualified to appear on AZLP's primary ballot in 2016, and he did so only by working on his petition drive full-time for approximately 70 days." Doc. 63 at 12 (citing Doc. 18 at 22, Third Kielsky Dec., ¶ 6). These statements were made with respect to candidate Gregory Kelly. *Id.* The Secretary contends that the only way Kielsky could know that Kelly worked full-time for a specific number of days is if he was told this information, as it is impossible for him to have this information through personal observation of the candidate. Doc. 66 at 10.

Plaintiffs do not argue that Kielsky's statement is offered for something other than the truth of the matter asserted, or that Kielsky acquired this information from first-hand observation. Plaintiffs assert that he obtained this information through contemporaneous reports "submitted directly to Plaintiff Kielsky in his capacity as Chair of AZLP, which have been submitted into the record." *Id.* They argue that Kielsky "is competent to testify to all matters relating to" his position as Chair of AZLP. Doc. 71 at 7 n.2.

---

[4] Rule 37(c)(1) sanctions are generally mandatory if a party violates its duty to disclose or supplement. The Ninth Circuit has held, however, that when application of Rule 37(c)(1) sanctions will "amount[] to dismissal of a claim, the district court [i]s required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith." *R & R Sails*, 673 F.3d at 1247. The Court's exclusion of the six declarations does not amount to dismissal of Plaintiffs' claim. As the Court explains below, the grant of the Secretary's motion for summary judgment is not based on the absence of these witnesses, and their presence would not result in a different outcome.

Competency is not the question. The Secretary's objection is based on hearsay, and Plaintiffs provide no basis for finding that Kielsky's statements regarding Mr. Kelly's signature-collection efforts are not hearsay or fall within a hearsay exception. Plaintiffs assert that the record upon which Kielsky relied has been placed in the record, and cite to the Second Declaration of Michael Kielsky (*id.*), but the second declaration merely attaches an email from Mr. Kelly stating that he has devoted 45 days (not 70 days) to "getting on the ballot" (Doc. 10 at 26). Nothing about the email suggests a solution to the hearsay problem. It clearly is an out-of-court statement offered for the truth of the matter asserted, and Plaintiffs identify no rule that would permit its admission at trial or in support of their summary judgment motion.[5]

The Secretary also asks the Court to strike a statement first contained in Plaintiffs' reply brief. Doc. 73 at 6. Plaintiffs quote a letter from a supporter sent to Kielsky, stating that the supporter "couldn't interest any independents (other than family) to sign" his nomination petitions. Doc. 71 at 18 (quoting Doc. 10 at 28). This too is hearsay, and Plaintiffs have identified no basis on which it is admissible.

## IV.    Constitutional Analysis.

Plaintiffs argue that A.R.S. §§ 16-321 and 16-322 violate the First and Fourteenth Amendments. Doc. 42. Specifically, Plaintiffs contend that the provisions place an impermissible burden on them under the Supreme Court's ballot access jurisprudence and in violation of their rights to freedom of speech, petition, assembly, and association for political purposes. Doc. 42 at 21-22, ¶ 59 (Count I); Doc. 63 at 4. Plaintiffs also argue that the provisions violate their rights to freedom of association and equal protection of the laws. Doc. 42 at 22-25 (Counts II and IV); Doc. 63 at 4, 13-16.[6]

---

[5] The email from Mr. Kelly is address to AZLP (Doc. 10 at 26), but Plaintiffs provide no evidence or argument that the email would be admissible as a business record of AZLP under Rule 803(6).

[6] In Count III, Plaintiffs allege a separate violation of their right to form a political party under the First and Fourteenth Amendments. Doc. 42 at 22-23. While they present a separate argument section concerning this right in their briefing (Doc. 71 at 19-20), they do not identify a separate test to be applied in determining if this right has been violated.

"States have a major role to play in structuring and monitoring the election process," but this power is not without limits. *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000). "Restrictions upon the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively, and may not survive scrutiny under the First and Fourteenth Amendments." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). "A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quotation marks and citation omitted); *accord. Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008).

Thus, the validity of a state election law is determined by applying a "balancing and means-ends fit analysis." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016). If the First and Fourteenth Amendment rights "are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed,* 502 U.S. 279, 289 (1992)). There is no litmus-paper test for separating valid and invalid election restrictions. Courts must make hard judgments based on the facts and circumstances of each case. *Storer v. Brown*, 415 U.S. 724, 730 (1974). In this case, the Court must balance Arizona's interest in ensuring a modicum of support for general election

Courts have identified the First and Fourteenth Amendment rights of voters and candidates implicated by ballot access restrictions, and tend to analyze them together using one test. *See Anderson v. Celebrezze*, 460 U.S. 780, 786 & n.7 (1983). As a result, the Court will consider Count III together with Count I, applying the test outlined below.

candidates against the burden imposed on Plaintiffs' First and Fourteenth Amendment rights by A.R.S. §§ 16-321 and 16-322.

### A. The Burden on Plaintiffs.

#### 1. Relevant Supreme Court Cases.

The Supreme Court has on several occasions addressed the constitutionality of state limitations on the ability of candidates to appear on the ballot. In *Williams v. Rhodes*, 393 U.S. 23 (1968), the Supreme Court addressed a series of election laws in Ohio that required members of new political parties who wished to appear on the presidential ballot to submit petitions signed by 15% of the number of voters in the last gubernatorial election and to satisfy other procedural hurdles. *Id.* at 24-25. The Supreme Court found that Ohio's "restrictive provisions [made] it virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties" (*id.* at 25), and held that the Ohio laws violated the Equal Protection Clause of the Fourteenth Amendment (*id.* at 34).

In *Jenness v. Fortson*, 403 U.S. 431 (1971), the Supreme Court addressed a Georgia law that permitted a candidate who failed to enter or win his party's primary election to have his name placed on the general election ballot if he obtained signatures from 5% of the voters eligible to vote in the last general election. *Id.* at 432. The Court found that the 5% requirement, although higher than most states, was "balanced by the fact that Georgia [had] imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes." *Id.* at 442. The Court upheld the 5% requirement. *Id.*

In *Storer*, the Supreme Court examined a California law that required independent candidates who wished to appear on the general election ballot to obtain signatures of between 5% and 6% of the entire vote cast in the preceding general election in the area where the candidate sought office. 415 U.S. at 726-27. The candidate's petition could not, however, be signed by voters who had voted in the preceding primary election (*id.* at 739), and all signatures had to be obtained during a 24-day period following the primary

(*id.* at 727). Because the pool of qualified signers was reduced by excluding primary election voters – a reduction which would have the effect of requiring a candidate to obtain signatures from more than 5% or 6% of the available signers – the Supreme Court remanded the case to determine the precise extent of the burden. *Id.* at 740, 746.

In *American Party of Texas v. White*, 415 U.S. 767 (1974), the Supreme Court considered a series of Texas laws that provided four methods for placing candidates on the general election ballot. *Id.* at 772. Of particular relevance here, minor political parties were allowed to nominate candidates through party conventions. *Id.* at 777. But to have these nominees appear on the general ballot, the parties were required to demonstrate support in the form of convention participants numbering at least 1% of the total votes cast for governor at the last general election. *Id.* If the required number of individuals did not participate in the nominating convention, the party could secure its candidate's position on the general ballot by circulating petitions for signature. *Id.* The party was required to obtain signatures from persons equaling 1% of the total votes in the last gubernatorial election, but a voter who had already participated in any other party's primary election or nominating process was ineligible to participate in a second nominating convention or sign a petition. *Id.* at 778. Additionally each signer had to give a notarized oath that she had not participated in any other party's nominating or qualification proceeding. *Id.* The Court upheld this scheme, finding, as a whole, that it "afford[ed] minority political parties a real and essentially equal opportunity for ballot qualification." *Id.* at 788.

In *Munro v. Socialist Workers Party*, 479 U.S. 189 (1986), the Supreme Court addressed the validity of a Washington law which required that a minority-party candidate for an office receive at least 1% of all votes cast for that office in the State's blanket primary election before she would be included on the general election ballot. *Id.* at 190. Because Washington used a blanket primary, registered voters could vote for any candidate regardless of the candidate's party affiliation. *Id.* at 192. The Court noted that "States may condition access to the general election ballot by a minor-party or

independent candidate upon a showing of a modicum of support among the potential voters for the office." *Id.* at 194. Emphasizing that there is no "litmus-paper test" for deciding when a ballot restriction violates First and Fourteenth Amendment rights, the Court held that the Washington requirement was valid. *Id.* at 195, 199.[7]

### 2. The Burden Imposed by the Arizona Statutes.

Plaintiffs contend that no federal court has upheld a statute requiring support from more than 5% of eligible voters, and that A.R.S. §§ 16-321 and 16-322 require AZLP candidates to secure support from up to 30% of eligible voters in AZLP's closed primary. Doc. 71 at 7. In making this argument, Plaintiffs compare the number of signatures or write-in votes required by the statutes to the number of voters eligible to vote in AZLP's closed primary. Doc. 63 at 5. Using this denominator, Plaintiffs assert that they are required to collect signatures or write-in votes of between 11% and 30% of eligible voters for the primary.

The Court's previous order questioned whether this was the correct math – whether the required number of petition signatures or write-in votes should be divided by the number of voters who can participate in the AZLP closed primary or by the number of qualified signers under the statute. Doc. 34 at 8-10. The two approaches produce very different results. Dividing by the number of qualified signers results in the percentages

---

[7] The Ninth Circuit considered the constitutionality of ballot access restrictions in *Lightfoot v. Eu*, 964 F.2d 865, 869 (9th Cir. 1992), *as amended* (July 6, 1992). *Lightfoot* considered a challenge to a California law which provided that write-in candidates could qualify for the general election ballot by receiving votes in the primary "equal in number to 1 percent of all votes cast for the office at the last preceding general election." *Id.* at 866. As here, AZLP had chosen to hold a closed primary. *Id.* at 870. The Ninth Circuit upheld the requirement, finding it "not significant that it was impossible for any Libertarian write-in candidate to meet the 1% threshold in the 1988 primary." *Id.* at 870. It noted that "the small number of voters eligible to vote in the Libertarian primary is not an impediment created by the State of California[,]" and that the party could choose to open its primary to non-party members or increase its membership to reduce its burden. *Id.* As the Court noted in its previous order, *Lightfoot* is not controlling because the Ninth Circuit based its ruling at least in part on the fact that California law included an alternative path that provided "easy access to the primary ballot" – a minor party candidate could simply gather 40 to 65 signatures. *Id.* at 870-72. While Arizona law provides an alternate route of signature gathering to appear on the primary ballot, Arizona's signature requirements are significantly higher than those imposed by the California law. Thus, the Court must still consider the Arizona scheme as a whole to determine whether it provides reasonable access to the ballot.

identified in the statutes – between 0.25% and 0.50% for most offices. Doc. 70 at 1, ¶ 2; Doc. 72-2 at 1, ¶ 2. This is well within the 5% limit upheld by the Supreme Court. Dividing by the number of AZLP registered voters allowed to participate in the closed primary produces the much larger percentages emphasized by Plaintiffs – up to 30% for some offices. Doc. 34 at 10.

Plaintiffs advance several arguments in support of their math. The Court will address these arguments in the next section of this order, but first will look at the actual numbers involved in this case.

Plaintiffs agreed during oral argument that Arizona could, consistent with *Jenness* and other Supreme Court cases, require candidates to obtain signatures from 5% of the voters eligible to vote in the last general election, provided it did not erect other obstacles to their participation. *See Jenness*, 403 U.S. at 442. During the 2016 general election, there were 3,588,466 registered voters in Arizona. *See* Arizona Secretary of State, Voter Registration & Historical Election Data, https://www.azsos.gov/elections/voter-registration-historical-election-data (last visited July 3, 2017). Thus, Arizona lawfully could require an AZLP candidate to obtain 179,423 signatures – 5% of the total number of registered voters – to appear on the general election ballot for a statewide office.

Instead, Arizona has adopted a two-step process. First, AZLP has qualified as a party entitled to continuing representation on the general election ballot by having a membership equal to at least two-thirds of one percent of all registered voters in the State (at least 23,684 members in 2016). A.R.S. § 16-804(B). Second, as members of such a qualified party, AZLP candidates for general state offices must obtain petition signatures or write-in votes equal to 0.25% of qualified signers under the statute, which in 2016 amounted to 3,034. Doc. 42-2 at 3.

The contrast between what is constitutionally permissible (179,423 petition signatures) and what Arizona requires (party membership of less than one percent of registered voters and petition signatures or write-in votes totaling 3,034) is striking. Looking only at these numbers, and recognizing that Plaintiffs make other arguments that

- 14 -

must be addressed below, it is difficult to conclude that Arizona's requirement is unconstitutionally burdensome. Statements in various Supreme Court cases seem to confirm this initial impression. In *Storer*, the Court observed:

> Standing alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each gathered 14 signers a day. On its face, the statute would not appear to require an impractical undertaking for one who desires to be a candidate for President.

415 U.S. at 740. In *American Party*, the Supreme Court noted that collecting 22,000 signatures in 55 days "does not appear to be either impossible or impractical, and we are unwilling to assume that the requirement imposes a substantially greater hardship on minority party access to the ballot." 415 U.S. at 783, 786.

Comparison to other Arizona parties and candidates is also informative. Independent candidates may appear on the Arizona general election ballot only if they obtain signatures from 3% of voters registered to vote in the relevant jurisdiction and who are not affiliated with a party qualified for representation on the next general election ballot. A.R.S. § 16-341 (E), (F). In 2016, this required 37,077 signatures to appear on the general election ballot for statewide office, more than ten times the number required from AZLP candidates. *See* Arizona Secretary of State, Voter Registration & Historical Election Data, https://www .azsos.gov/elections/voter-registration-historical-election-data (last visited July 3, 2017) (reporting 1,235,911 registered voters in Arizona in 2016 who were not members of the Democratic, Green, AZLP, or Republican parties).

Candidates from the major parties also have higher burdens than AZLP candidates. Republican candidates for statewide office must secure 5,801 petition signatures or write-in votes to make the general ballot, and Democratic candidates must secure 5,352. Doc. 42-2 at 3; Doc. 70 at 3, ¶ 10. The requirement for Green Party candidates is lower – 806 signatures or write-in votes – but the Green Party faces a hurdle AZLP does not. *Id.* Because the Green Party does not have enough members to qualify for continuing representation on the general ballot, the Green Party must secure at least

1  25,000 petition signatures every four years, a requirement not imposed on AZLP,

2  Republicans, or Democrats.  A.R.S. § 16-803; Doc. 42-4 at 2, ¶ 3; Doc. 70 at 7, ¶ 38.

3      Thus, when actual numbers are considered, the ballot-qualification requirements

4  for AZLP candidates are well below constitutionally permissible requirements and lower

5  than those imposed on other candidates in Arizona.

6              **3.    Plaintiffs' Arguments.**

7      As noted, Plaintiffs argue that the Arizona laws are unconstitutional because they

8  require signatures or write-in votes from more than 5% of voters when the percentage is

9  calculated on the basis of persons permitted to vote in their closed primary.  Plaintiffs

10  make several arguments in support of this math.  The Court does not find them

11  persuasive.[8]

12              **a.    Ballot Qualification of AZLP.**

13      Plaintiffs argue that Arizona has already determined that AZLP has the requisite

14  modicum of support to qualify for continued representation on the ballot, and that no

15  additional requirements are needed to further the State's interest.  Doc. 63 at 5.  As

16  Plaintiffs acknowledge, however, support for a party is distinct from support for a

17  candidate.  *Id.* at 5-6.  Cases recognize that states have a legitimate interest in ensuring

18  that *candidates* – not just parties – have a significant modicum of support before their

19  names appear on general ballots.  *See Anderson*, 460 U.S. at 788 n.9 ("The State has the

20  undoubted right to require *candidates* to make a preliminary showing of substantial

21  _____

22      [8] Plaintiffs make some separate arguments with respect to Arizona's write-in
requirements for ballot access.  To the extent Plaintiffs argue that write-in requirements

23  are too stringent because they can be satisfied only through votes in the limited primary
election, the Court notes that states are not required to provide a write-in method for

24  qualifying for a general election ballot.  *Burdick*, 504 U.S. at 441 ("when a State's ballot
access laws pass constitutional muster as imposing only reasonable burdens on First and

25  Fourteenth Amendment rights . . . a prohibition on write-in voting will be presumptively
valid.").  If a state's ballot-qualification scheme can pass constitutional muster by

26  providing no write-in method for qualifying, it certainly can pass constitutional muster by
providing a restricted write-in method, so long as its other ballot-access methods are

27  reasonable.  Because the Court finds Arizona's signature method reasonable, it need not
address Plaintiffs' separate write-in arguments.

28

support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous *candidates*.") (emphasis added); *Am. Party*, 415 U.S. at 789 ("requiring *independent candidates* to evidence a 'significant modicum of support' is not unconstitutional") (quoting *Jenness*, 403 U.S. at 442) (emphasis added, footnote omitted). Indeed, state restrictions upheld by the Supreme Court focus on individual candidates, requiring them to obtain a specified number of petition signatures to appear on a general ballot. *See, e.g.*, *Storer*, 415 U.S. at 727.

No stretch of the imagination is needed to conclude that a candidate could run for office without significant support, despite the existence of general support for her party. If a candidate was not required to show any threshold of support through votes or petition signatures, she could win her primary and reach the general ballot with no significant modicum of support at all. This is especially true where, as here, "Libertarian candidates typically run unopposed in the AZLP primary[.]" Doc. 71 at 15. An unopposed candidate could win a spot on the general election ballot with only one vote in such a primary.

Plaintiffs appear to concede that the State has an independent interest in requiring an individual candidate to show that she enjoys sufficient support to be included on the ballot. Plaintiffs argue, however, that primary elections are inherently unsuitable for measuring voter support for minor party candidates. Doc. 63 at 7. They emphasize that AZLP candidates generally receive large numbers of votes in general elections but few votes in primary elections, and thus primary vote totals do not show whether they enjoy support "among the general electorate." *Id.*

But Plaintiffs are not limited to showing support by obtaining votes in the primary election. AZLP candidates may obtain the designated number of signatures from qualified signers before the primary, win the primary with fewer votes, and still be placed on the general election ballot. If Plaintiffs are concerned that the true level of their support is more accurately reflected by results in the general election, rather than results

in their smaller closed primary, then A.R.S. §§ 16-321 and 16-322 take a step in that direction by permitting AZLP to obtain signatures not only from registered AZLP voters, but also from registered independents and unaffiliated voters – a pool totaling more than one million voters in Arizona.  Doc. 70 at 3, ¶ 16; Doc. 72-2 at 4, ¶ 16.

What is more, nothing in the Arizona statutes suggests that the State views a party's qualification for ballot access as sufficient for individual candidate qualification. To the contrary, parties who meet the requirements for representation on the ballot qualify, under the language of the statute, only to have a "column" on the general election ballot.  A.R.S. § 16-801(A).  They do not qualify to have candidates on the ballot.  *Id.* Candidates must meet the additional support requirements through petition signatures or write-in votes.  A.R.S §§ 16-321, 16-322.  This structure shows that Arizona does not view a party's qualification as tantamount to candidate qualification.

### b.     Supreme Court References to "Eligible Voters."

Plaintiffs argue that "[e]very Supreme Court and lower federal court decision analyzing the constitutionality of ballot access laws cited by the parties in the proceedings thus far measures the modicum of support that such a law requires as a percentage of eligible voters."  Doc. 63 at 6.  True, but this does not mean that the phrase "eligible voters" can be lifted from the cases and applied to the AZLP closed primary. None of the Supreme Court cases addressed a closed primary; each addressed qualification requirements for general election ballots.  *See Williams*, 393 U.S. 23; *Jenness*, 403 U.S. 431; *Storer*, 415 U.S. 724; *Am. Party*, 415 U.S. 767; *Munro*, 479 U.S. 189.

This distinction is significant.  The Supreme Court has held that states may require candidates to show support from up to 5% of the general electorate.  *See*, *e.g.*, *Jenness*, 403 U.S. 431.  Arizona requires a showing of support from between 0.25 and 0.50% of qualified signers – a group smaller than the general electorate – and therefore requires an even lower percentage of the general electorate.  This is best illustrated with actual numbers.  In 2016, Arizona had 3,588,466 registered voters.  Arizona Secretary of State,

Voter Registration & Historical Election Data, https://www.azsos.gov/elections /voter-registration-historical-election-data (last visited July 3, 2017).   For AZLP candidates for statewide office, there were 1,188,771 qualified signers.  Doc. 69 at 7; Doc. 70 at 3, ¶¶ 16, 17; Doc. 72-2 at 4, ¶¶ 16, 17.  0.50% of these qualified signers – which totals 5,944 voters – would be 0.16% of the total registered voters.  0.25% would be 2,972 voters, equal to 0.08% of total registered voters.   Thus, Arizona effectively requires AZLP candidates to obtain signatures from less than 0.20% of registered voters, well below the 5% upheld by the Supreme Court.

While the Supreme Court has upheld state laws requiring candidates to obtain signatures from up to 5% of the general electorate, additional state law restrictions on who may sign candidate petitions may increase the burden on candidates and thus affect the constitutionality of the state laws in question.   In *Storer*, the Supreme Court considered a law that limited those eligible to sign a nomination petition for an independent candidate to registered voters who had not participated in the primary election.  415 U.S. at 739.  The Court noted that this limitation could substantially reduce the pool of eligible signers and thus increase the candidate's burden to obtain signatures to an amount exceeding 5% of eligible signers.  *Id.* at 739.  Noting that this "would be in excess, percentagewise, of anything the Court ha[d] approved to date," the Court remanded the case to determine the precise extent of the burden.  *Id.* at 739, 746.  A similar problem does not exist here.  Arizona has limited those who may sign a nominee petition to "qualified signers," but this is a substantial pool that included 1,188,771 potential signers in 2016.  Doc. 69 at 7; Doc. 70 at 3, ¶¶ 16, 17; Doc. 72-2 at 4, ¶¶ 16, 17.  Arizona requires that AZLP candidates obtain signatures from 0.50% or less of this pool.

### c.    Other Responses to Plaintiffs' Math.

Plaintiffs' use of closed-primary voters as the denominator in its percentage calculations is flawed for several additional reasons, some of which are related to the discussion above.

First, in *Munro*, the Supreme Court noted that "it is now clear that States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among *the potential voters for the office*." 479 U.S. at 193 (emphasis added). The potential voters for the office are those who will vote in the general election. Measuring support for a candidate only within his own party, as Plaintiffs do by focusing on their closed primary, does not show the support a candidate enjoys among voters for her office in the general election. Plaintiffs identify no case where the required modicum of support was measured in such a way.

Second, although Arizona requires parties to hold primaries, and specifies the number of petition signatures required to appear on the primary ballot, it requires this as part of a process for appearing on the general election ballot – the ultimate object of the Arizona legislation. As noted above, a person who obtains the required number of signatures for the AZLP primary can qualify for the general election ballot even if she receives fewer votes in the primary than the number of petition signatures she obtained. She simply must win the primary, even with only a single vote. Thus, the modicum of support is shown by the petition signatures (or in the number of write-in votes if the candidate chooses that path). The Supreme Court has recognized that states may use primaries as the method for establishing a sufficient modicum of support to appear on a general election ballot. *Munro*, 479 U.S. at 196 ("The primary election . . . functions to winnow out and finally reject all but the chosen candidates. We think that the State can properly reserve the general election ballot for major struggles . . . by conditioning access to that ballot on a showing of a modicum of voter support.") (quotation marks and citations omitted); *id.* at 197-98 ("To be sure, candidates must demonstrate, through their ability to secure votes at the primary election, that they enjoy a modicum of community support in order to advance to the general election. But requiring candidates to demonstrate such support is precisely what we have held States are permitted to do."). Because the ultimate effect of the Arizona legislation is to determine who appears on the general election ballot, the Arizona percentage requirements should be compared to the

general electorate, consistent with the Supreme Court cases discussed above. As shown above, the percentage of general election voters from whom AZLP candidates must obtain signatures is well below 5%.

Third, if the percentage of closed-primary voters is relevant at all, AZLP candidates are not helpless to affect it. While some candidates may have been required to obtain signatures or primary votes from 30% of registered AZLP voters this year, they could reduce this percentage in subsequent years by attracting more voters to AZLP. The facts suggest that increasing AZLP membership is feasible. As the Secretary notes, membership increased from 24,394 in 2016 to 31,886 by April 1, 2017. Doc. 70 at 3, 6 ¶¶ 17, 34; Doc. 72-2 at 4, 6-7 ¶¶ 17, 34. A party may not use its low membership to reduce the support it must show for presence on the general ballot. States are not required to grant an advantage to less popular candidates to ensure they appear on the general election ballot. *See Munro*, 479 U.S. at 198. States only need ensure that the requirements of support for the office are reasonable and do not freeze the political status quo, but offer a real opportunity for minority and independent candidates to qualify for the ballot. *Am. Party*, 415 U.S. at 787.

In summary, the Court concludes that the Arizona legislation should be analyzed by looking to the percentage of qualified signers or the general electorate, not by focusing solely on the number of voters in AZLP's closed primary. When so tested, Arizona's requirement falls well below the 5% requirement upheld in Supreme Court cases.

**4.      2016 Election Results.**

There is no dispute that the Arizona statutes increased the number of signatures AZLP candidates must obtain. For the 2016 election, AZLP candidates for state legislative positions were required to obtain signatures or write-in votes from between 144 and 273 qualified signers, depending on the size of their district. Doc. 70 at 2, ¶ 4; Doc. 72-2 at 2, ¶ 4. Prior to H.B. 2608, these candidates had signature requirements as low as 7 signatures. Similarly, an AZLP candidate for Congress was required to obtain between 529 and 785 signatures or write-in votes in 2016, but previously needed only

between 24 and 43 signatures to qualify for the ballot. Doc. 70 at 2, ¶¶ 7, 8; Doc. 72-2 at 2, ¶¶ 7, 8. Candidates for statewide office, such as governor, need signatures from 0.25% of qualified signers. Doc. 70 at 3, ¶ 10; Doc. 72-2 at 3, ¶ 10. In 2016, this amounted to 3,034 signatures for AZLP candidates. Doc. 70 at 3, ¶ 10; Doc. 72-2 at 3, ¶ 10. Prior to H.B. 2608, an AZLP gubernatorial candidate was required to submit 133 valid signatures. Doc. 70 at 3, ¶ 11; Doc. 72-2 at 3, ¶ 11.

It is undisputed that only one AZLP candidate qualified for the primary ballot in 2016 under the new signature requirements. Doc. 64 at 3, ¶ 11; Doc. 70 at 12, ¶ 11. Plaintiffs state that none appeared on the general election ballot. In contrast, 35 AZLP candidates appeared on the general election ballot in 2004, 19 in 2008, and 18 in 2012. Doc. 64 at 3, ¶ 10; Doc. 70 at 11, ¶ 10.

The Supreme Court has addressed the evidentiary value of comparing the number of minority party candidates appearing on the ballot before and after enactment of a challenged ballot access law. While such comparison is relevant, it is not controlling. As the Supreme Court explained in *Munro*:

> Much is made of the fact that prior to 1977, virtually every minor-party candidate who sought general election ballot position so qualified, while since 1977 only 1 out of 12 minor-party candidates has appeared on that ballot. Such historical facts are relevant, but they prove very little in this case, other than the fact that § 29.18.110 does not provide an insuperable barrier to minor-party ballot access. It is hardly a surprise that minor parties appeared on the general election ballot before § 29.18.110 was revised; for, until then, there were virtually no restrictions on access. Under our cases, however, Washington was not required to afford such automatic access and would have been entitled to insist on a more substantial showing of voter support. Comparing the actual experience before and after 1977 tells us nothing about how minor parties would have fared in those earlier years had Washington conditioned ballot access to the maximum extent permitted by the Constitution.

479 U.S. at 196-97.

The Court finds the present case very similar to *Munro*, where Washington passed a law which required candidates to receive at least 1% of all votes cast for the candidates'

office in the state's open primary election before the candidate's name would be placed on the general election ballot. The Ninth Circuit found the law invalid primarily because of its practical effect on minor party candidates. The Court of Appeals noted that "[p]rior to 1977, candidates of minor parties qualified for the general election ballot in contests for statewide office with regularity," but "[t]he 1977 amendment . . . worked a striking change." *Socialist Workers Party v. Sec'y of State of Wash.*, 765 F.2d 1417, 1419 (9th Cir. 1985). "According to the affidavit of Washington's Supervisor of Elections, since 1977 minor parties have not been successful at qualifying candidates for the state general election ballot for statewide offices. Although one or more minor parties nominated candidates in each of the four statewide elections held between 1978 and 1983, none qualified for the general election ballot." *Id.* (quotation marks omitted). Given these results, the Ninth Circuit found that Washington's ballot access law seriously impinged on the plaintiffs' protected rights and that Washington had "failed to present an interest substantial enough to warrant the restraint imposed on those rights." *Id.* at 1422.

The Supreme Court reversed, even in the face of the election results on which the Ninth Circuit relied. 479 U.S. at 196-97. The Supreme Court noted that its previous cases "establish with unmistakable clarity that States have an 'undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot[.]'" *Id.* at 194 (quoting *Anderson*, 460 U.S. at 788-89). Because the Washington law imposed lower requirements than the laws upheld in *Jenness* and *American Party*, the Supreme Court found it constitutional. *Id.* at 199.

Plaintiffs in this case make essentially the same argument as the plaintiffs in *Munro*. They cite statistics showing that it is now more difficult for their candidates to qualify for the primary and general election ballots. But the Supreme Court in *Munro, American Party*, and *Jenness* upheld state ballot qualification laws that were more burdensome than Arizona's. The laws in these cases required candidates to demonstrate support of between 1% and 5% of all registered voters, where Arizona requires only between 0.25% and 0.50% of the smaller pool of qualified signers – and, as shown above,

an even smaller percentage of registered voters. In light of these Supreme Court cases and the discussion of actual election results in *Munro*, the Court cannot conclude that Plaintiffs have shown an unconstitutional burden.

### 5. Impact of the Scheme as a Whole.

Courts must review a state's ballot-access scheme as a whole. *Storer*, 415 U.S. at 730. The Court accordingly will consider other restrictions in the Arizona law.

Only two restrictions are apparent: AZLP candidates are limited to collecting signatures from qualified signers, and an individual who signs a nominating petition may not sign any other nominating petition. A.R.S. § 16-321(A), (E). These are not significant restrictions. Candidates may obtain signatures physically or electronically, A.R.S. §§ 16-321, 16-316-318, and, unlike many states, Arizona imposes no time limit on signature gathering as long as the nomination petitions are filed between 120 and 90 days before the primary election, A.R.S. 16-314. Other than complaining about the number of signatures required, Plaintiffs do not argue that Arizona has unduly restricted the signature gathering process.

Plaintiffs do contend that they cannot, in practice, obtain signatures from non-party members. They argue that because "[n]on-members are not permitted to vote in AZLP's primary, [] independent and unaffiliated voters have no incentive to support a candidate seeking to run in such an election." Doc. 63 at 7. As a result, they argue, they are not able to obtain signatures from non-party members in practice. But this assertion is hard to square with Plaintiffs assertion that they regularly receive significant support in the general election. Doc. 63 at 7. If a registered independent or unaffiliated voter supports an AZLP candidate in the general election, she has every incentive to sign the candidate's nominating petition. Plaintiffs cite declarations to support their assertion that the closed nature of AZLP's primary election deters independent and unaffiliated voters from signing their petitions. But the cited declarations actually show that it is a difference in philosophy between the voters and AZLP, or a reluctance by the candidates to seek support from these voters, that keeps AZLP candidates from obtaining the

signatures of independent voters. *See, e.g.*, Doc. 42-4 at 3, ¶ 7 (declaration from Kim Allen asserting that she does not like to seek support from independent voters and they do not generally want to sign her petition because they are not part of the party and "may not share [their] political philosophy and goals").

The parties dedicate significant briefing to the question of whether AZLP candidates exercised reasonable diligence when trying to secure placement on the 2016 ballot. They reach contrary answers, relying on declarations and expert opinions concerning the quality of the efforts made by AZLP candidates and what could reasonably be expected of them. Facts relating to the ability of candidates to obtain ballot access in practice may inform the Court's inquiry into the reasonableness of the burden imposed on Plaintiffs. *See Munro*, 479 U.S. at 196-98; *Nader*, 531 F.3d at 1035. But where the Court has determined that the quantity of signatures required for ballot access falls well within the 5% requirement generally upheld by the Supreme Court, and Plaintiffs have not identified any additional restrictions that would increase the burden imposed on them, the Court need not engage in a detailed and extensive factual consideration of the hours and techniques employed by each AZLP candidate to obtain signatures or write-in votes. While the Supreme Court has directed lower courts to consider whether a reasonably diligent candidate could be expected to satisfy the signature requirements and gain a place on the ballot, *Storer*, 415 U.S. at 742, evidence that some candidates struggled to satisfy those requirements is not, as *Munro* shows, sufficient to show that the scheme imposed an unconstitutional burden. As the Supreme Court has made clear, states are not required to provide candidates with essentially "automatic access" to the ballot. *Munro*, 479 U.S. at 197.

Plaintiffs additionally argue that AZLP candidates must seek signatures from independent and unaffiliated voters, a requirement that violates their right to freedom of association. Plaintiffs rely on *California Democratic Party v. Jones*, a case in which the Supreme Court considered a California law mandating the use of a blanket open primary to select each party's nominee. 530 U.S. at 570, 581-82. The Court noted that "a

corollary of the right to associate is the right not to associate," and "[i]n no area is the political association's right to exclude more important than in the process of selecting its nominee." *Id.* at 574, 575. Forcing a party to involve non-members in its nominee selection process will inevitably change the party's message. *Id.* at 581-82. As a result, a law requiring parties to open their nominee selection process to non-party members imposes a heavy burden and is "unconstitutional unless it is narrowly tailored to serve a compelling state interest." *Id.* at 582.

The Ninth Circuit similarly considered the validity of an Arizona provision allowing voters who were unaffiliated, registered as independents, or registered as members of parties that are not on the primary ballot to vote in the primary of their choice. *Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1280 (9th Cir. 2003). Relying on *Jones*, the Ninth Circuit emphasized that forced association with non-members in the nominee selection process raised a risk of "influenc[ing] the choice of the nominee at the primary and [] caus[ing] partisan candidates to change their message to appeal to a more centrist voter base." *Id.* at 1282. The Ninth Circuit noted that "forcing the Libertarians to open their primary to nonmembers for the selection of party candidates raises serious constitutional concerns," but ultimately determined that resolution of these concerns was a factual issue and remanded to the district court for further consideration. *Id.* On remand, the district court found the provision unconstitutional because it imposed a severe burden on AZLP that was not justified by a compelling interest. *Arizona Libertarian Party v. Brewer*, No. 02-144-TUC-RCC (D. Az. Sept. 27, 2007) (unpublished order).

*Jones* and *Bayless* are distinguishable from this case. The law in *Jones* directly mandated the use of an open primary. Similarly, the law in *Bayless* mandated that nonmembers be allowed to vote in AZLP's primary. Here, Arizona law requires only that AZLP candidates obtain a certain number of signatures before they may appear on the primary ballot. They are not required by the law to seek those signatures from non-AZLP voters. True, a candidate who cannot establish a modicum of support from the

ranks of her own party may feel the need to turn to nonmembers to supplement her support, but the law does not require her to do so. This is a significant distinction from the legally-mandated participation of other parties at issue in *Jones* and *Bayless*.

Because Plaintiffs are required, at most, to obtain signatures from 30% of registered AZLP voters in any relevant jurisdiction, they can obtain sufficient signatures without looking outside their party. If the candidates or the party find this too daunting a task, they can work to increase their party membership. The Supreme Court has made clear that Arizona is not required to decrease its ballot access requirements for the benefit of less popular parties or candidates. *Munro*, 479 U.S. at 198 ("States are not burdened with a constitutional imperative to reduce voter apathy or to 'handicap' an unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot.").

There is another significant distinction between this case and the laws at issue in *Jones* and *Bayless.* Those laws permitted nonmembers of a party to participate directly in selection of the party's candidates. In this case, although a candidate may feel the need to seek signatures from qualified signers who are not members of her party, those signers will not have the right to vote in the AZLP closed primary. Thus, AZLP will be free to select its nominee without involvement of nonmembers.

Finally, the Court notes that Plaintiffs' arguments could lead to absurd results. Suppose a minority political party has only five members. If Plaintiffs' associational argument is correct, Arizona could not require the party's candidates, as a practical matter, to obtain petition signatures from anyone other than party members. And because the party would be entitled to hold a closed primary under *Jones* and *Bayless*, the party could place candidates on the general election ballot with support from five or fewer voters. Such a result would be plainly inconsistent with Arizona's "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot[.]" *Anderson*, 460 U.S. at 788-89.

The Court concludes that Arizona's signature requirements, considered as a whole, do not impose a severe burden on Plaintiffs' right to freedom of association.

## B. Constitutional Balancing.

In light of the discussion above, the Court concludes that the burden imposed on Plaintiffs by A.R.S. §§ 16-321 and 16-322 is reasonable. This is true when the actual numbers are considered, and whether the percentage requirement is calculated on the basis of qualified signers or the general electorate. In both instances, Arizona imposes a burden on Plaintiffs well below the 5% requirement upheld by the Supreme Court. The fact that Plaintiffs placed fewer candidates on the ballot in 2016 is relevant, but not determinative. The total number of signatures required for AZLP candidates is lower than the numbers required for independent candidates and candidates from the two major parties, and a lighter burden than imposed on Green Party candidates when the Green Party's four-year petition requirement is considered. The Court cannot conclude that Plaintiffs have shown that the signature requirements pose an insurmountable obstacle to ballot access. Comparing the higher burdens placed on the other parties and independent candidates, the Court also concludes that the Arizona requirements are not discriminatory against Plaintiffs.[9]

"[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Norman*, 502 U.S. at 289). The Court finds Arizona's interests sufficient here. As the Supreme Court has held, "[t]here is

---

[9] It is well-accepted that states may impose different restrictions on parties' access to the ballot depending on their size and history. *See Jenness*, 403 U.S. at 441-42 ("The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. Georgia has not been guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot."); *id.* at 440-41 ("We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths [to the ballot], neither of which can be assumed to be inherently more burdensome than the other.").

surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot – the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness*, 403 U.S. at 442; *see also Munro*, 479 U.S. at 193; *Am. Party*, 415 U.S. at 782; *Lightfoot*, 964 F.2d at 871.

Plaintiffs argue that the State has failed to show that it has a genuine interest in requiring a modicum of support before appearance on the general election ballot – that Arizona has not shown that it has experienced voter confusion or fraud. Doc. 71 at 15. But the Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194. As the Supreme Court explained:

> To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.

*Id.* at 195-96.

Balancing Arizona's legitimate interest in requiring a significant modicum of support before appearance on the general election ballot against the reasonable and nondiscriminatory burdens imposed by A.R.S. §§ 16-321 and 16-322, the Court concludes that the statutes are constitutional.[10]

---

[10] The Court notes that it would reach this conclusion even if the evidence excluded at the beginning of this order were considered. Comparable evidence was not sufficient to defeat the state restrictions in *Munro*, and the Court concludes that it would not be sufficient here. *See* 479 U.S. at 196-97.

### C.    Freedom of Association and Equal Protection.

Plaintiffs claim in Counts II and IV that the Arizona statutes violate their rights to freedom of association and equal protection.  Doc. 42 at 22-25; Doc. 63 at 4, 13-16.  Plaintiffs' freedom of association arguments are dealt with above.  The Arizona statutes do not legally require Plaintiffs to associate with voters outside of their party or to include such voters in their primary elections, as did the laws at issue in *Jones* and *Bayless*.

Plaintiffs have also failed to show an equal protection violation.  For reasons discussed above, the Court finds the Arizona laws to be nondiscriminatory.  And even if H.B. 2608 could be viewed as having a greater impact on AZLP than other Arizona political parties, it would violate equal protection only if Plaintiffs showed that it was enacted with a discriminatory intent.  *Washington v. Davis*, 426 U.S. 229 (1976) (disparate impact resulting from a facially neutral law, without more, is not sufficient to establish a violation of the Equal Protection Clause).  Plaintiffs do not attempt to make this showing.

**IT IS ORDERED** that Plaintiffs' motion for summary judgment (Doc. 63) is **denied** and the Secretary's cross-motion for summary judgment (Doc. 69) is **granted**.  The Clerk of Court shall enter judgment in accordance with this order and terminate this matter.

Dated this 7th day of July, 2017.

_____
David G. Campbell
United States District Judge